Filing # 61449353 E-Filed 09/07/2017 04:29:23 PM

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA

CASE NO.: 16-2016-CA-005696-XXXX-MA
DIVISION: CV-A

SUSAN E. AKEL and
SALEEM AKEL, her husband,

    Plaintiffs,

v.

LOREN Z. CLAYMAN, M.D.,
MARK A. CLAYMAN, M.D.,
LOREN Z. CLAYMAN, M.D., P.A.,
a Florida corporation,
ALLERGAN, INC.,
a foreign corporation,
ALLERGAN SALES, LLC,
a foreign limited liability company, and
ALLERGAN USA, INC.,
a foreign corporation,

    Defendants.

_____/

## COMPLAINT

The Plaintiffs, SUSAN E. AKEL and SALEEM AKEL, her husband, sue the Defendants, LOREN Z. CLAYMAN, M.D., MARK A. CLAYMAN, M.D., LOREN Z. CLAYMAN, M.D., P.A., a Florida corporation, ALLERGAN, INC., a foreign corporation, ALLERGAN SALES, LLC, a foreign limited liability company, and ALLERGAN USA, INC., a foreign corporation, and allege the following:

### GENERAL ALLEGATIONS

1.     This is an action for damages in excess of $15,000, exclusive of attorney's fees, costs, and interest.

2.      All conditions precedent to the filing of this action have been performed or have occurred.

3.      At all times material hereto, the Plaintiffs, **SUSAN E. AKEL** (hereinafter "Ms. Akel") and **SALEEM AKEL** (hereinafter "Mr. Akel"), were and are residents of, and permanently domiciled in, the State of Florida.

4.      At all times material hereto, the Defendant **LOREN Z. CLAYMAN, M.D.** (hereinafter "Loren Z. Clayman") was and is a resident of Jacksonville, Duval County, Florida.

5.      At all times material hereto, the Defendant **MARK A. CLAYMAN, M.D.** (hereinafter "Mark A. Clayman") was and is a resident of Jacksonville, Duval County, Florida.

6.      At all times material hereto, Loren Z. Clayman was and is a physician licensed to practice medicine by the State of Florida, who was and is practicing medicine in Duval County, Florida at his principal place of business located at 1801 Barrs Street, Suite 200, Jacksonville, Florida 32204 and/or 2 Shircliff Way, Suites 200-220, Jacksonville, Florida 32204.

7.      At all times material hereto, Mark A. Clayman was and is a physician licensed to practice medicine by the State of Florida, who was and is practicing medicine in Duval County, Florida at his principal place of business located at 1801 Barrs Street, Suite 200, Jacksonville, Florida 32204 and/or 2 Shircliff Way, Suites 200-220, Jacksonville, Florida 32204.

8.      All medical care and treatment rendered to **SUSAN E. AKEL** upon which the claims set forth herein are based took place in Jacksonville, Duval County, Florida.

9.      At all times material hereto, Loren Z. Clayman held himself out as a specialist in the area of plastic surgery.

10.     At all times material hereto, Mark A. Clayman held himself out as a specialist in the area of plastic surgery.

2

11.     At all times material hereto, the Defendant **LOREN Z. CLAYMAN, M.D., P.A.** (hereinafter "Clayman PA") was and is a Florida corporation, with its principal place of business at 1801 Barrs Street, Suite 200, Jacksonville, Florida 32204 and/or 2 Shircliff Way, Suites 200-220, Jacksonville, Florida 32204.

12.     At all times material hereto, Loren Z. Clayman and Mark A. Clayman were and are employees, agents or apparent agents of Clayman PA; at all times material hereto, Loren Z. Clayman and Mark A. Clayman were acting in the course and scope of their employment, agency or apparent agency with Clayman PA.

13.     The Defendant **ALLERGAN, INC.** is a foreign corporation existing and operating under the laws of the State of Delaware, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

14.     The Defendant **ALLERGAN, INC.** is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit:  researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

15.     The Defendant **ALLERGAN, INC.** may be reached for service of process in the State of Florida through its registered agent, CT Corporation System at 1201 Hays Street, Suite 105, Tallahassee, Florida 32301.

16.     The Defendant **ALLERGAN SALES, LLC** is a foreign limited liability company, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

3

17.    The Defendant **ALLERGAN SALES, LLC** is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit:  researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

18.    The Defendant **ALLERGAN SALES, LLC** may be reached for service of process in Florida through its registered agent, CT Corp. System, at 1200 South Pine Island Road, Plantation, Florida  33324.

19.    The Defendant **ALLERGAN USA, INC.** is a foreign corporation existing and operating under the laws of the State of Delaware, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California  92612.

20.    The Defendant **ALLERGAN USA, INC.** is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit:  researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

21.    The Defendant **ALLERGAN USA, INC.** may be reached for service of process in Florida through its registered agent, CT Corp. System, at 1200 South Pine Island Road, Plantation, Florida  33324.

22.    The Defendants **ALLERGAN, INC., ALLERGAN SALES, LLC**, and **ALLERGAN USA, INC.** are hereinafter collectively referred to as "Allergan."

4

## PROCEDURAL ALLEGATIONS

23.     Pursuant to an agreement executed by the attorney for Loren Z. Clayman, Mark A. Clayman, and Clayman P.A. on February 22, 2017, and by the attorney for Mr. and Ms. Akel on April 7, 2017, Mr. and Ms. Akel have complied with all conditions precedent and pre-suit requirements for the filing of the instant lawsuit.

## FACTUAL ALLEGATIONS

### Allergan's Natrelle Saline Filled Breast Implants

24.     In 1962, two Texas plastic surgeons performed the first breast augmentation surgery using silicone gel filled implants.  In 1963, Dow Corning began manufacturing silicone gel filled breast implants based upon the Texas doctors' designs.

25.     Donald K. McGhan worked at the laboratory where Dow Corning first made breast implants.  In 1974 he founded McGhan Medical Corp., which began marketing silicone filled breast implants in 1975.

26.     In 1986 McGhan Medical Corp. merged with First America Corporation, changing its name to Inamed.  The new company's breast implants were still labeled McGhan breast implants.  By this time the company was one of the largest breast implant manufacturers in the world.

27.     As a result of emerging safety concerns, in 1988 the United States Food and Drug Administration (FDA) re-classified silicone gel filled breast implants as Class III medical devices, which then required breast implant manufacturers to submit Pre-Market Approval (PMA) applications to the FDA to prove by valid scientific data that their respective implants were safe and effective.

5

28.    After reviewing the PMA applications of the different silicone breast implant manufacturers (including those of Inamed/McGhan), in 1992 the FDA prohibited the sale of silicone breast implants.

29.    In 1994, a $4 billion class action lawsuit over silicone filled breast implants was settled.  Inamed contributed approximately $32,000,000 toward the settlement.

30.    In 1998, Inamed removed and replaced Donald K. McGhan from his position as chairman and chief executive of the company.[1]

31.    On November 16, 1999, Inamed filed a PMA for the "McGhan Medical RTV Saline-Filled Breast Implant," later known as the "Natrelle Saline-Filled Breast Implant."  On May 10, 2000, the FDA issued a letter approving the PMA.

32.    In March of 2006, Inamed merged with Allergan, Inc., a company that makes products for eye care, neuroscience and dermatology, including its best known product, Botox, the injectable wrinkle treatment.  Afterward, McGhan Natrelle Saline Filled Breast Implants became known as "Allergan Natrelle Saline Filled Breast Implants."

33.    On November 17, 2006, the FDA approved PMA's from both Allergan and Mentor (Allergan's main U.S. competitor in the design and manufacture of breast implants) for new silicone filled breast implants.

34.    On February 20, 2013, the FDA approved Allergan, Inc.'s PMA for the Natrelle 410, anatomically shaped highly cohesive silicone gel-filled breast implants, a type of breast implants that are commonly referred to as "gummy bear" implants.  The new implants were softer, more cohesive, and more anatomically shaped than saline filled implants.

35.    In the last several years, silicone gel-filled implants have become the most

---

[1]    McGhan is currently serving the remainder of a 10-year prison sentence in Texas for wire fraud in relation to a scheme in which he attempted to use real estate investors' money for another breast implant business.

commonly used types of breast implants in the U.S.

36.     With all Natrelle breast implants, Inamed/Allergan included its "ConfidencePlus Warranty." According to the ConfidencePlus warranty literature provided by Allergan, the warranty program applied to all FDA-approved Natrelle breast implants, provided the implants were used:

- As intended by appropriately qualified and licensed surgeons, in accordance with current and accepted plastic surgery techniques
- In accordance with the current *Natrelle* Breast Implant Directions for Use, found at www.allergan.com/labeling/usa.htm.

However, the warranty only applied to cases of:

- Loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention
- Capsular contracture (Baker Grade III/IV) with *Natrelle* Gel implants that requires surgical intervention

37.     Under Allergan's *ConfidencePlus Warranty Matrix*, the Standard warranty comes with Natrelle implants free of additional cost, while the Premier warranty cost an additional $100 until 2014, and $200 thereafter; both warranties have terms of coverage of 10 years. The Standard warranty provides for a lifetime replacement of the ruptured implant, replacement of the contralateral implant (for 10 years)[2], and $1,200 for the cost of replacement/revision surgery. The Premier warranty provides for lifetime replacement of both the ruptured and contralateral implants, plus $2,400 for the cost of replacement/revision surgery.

---

[2]     At first, only Natrelle Style 163 saline filled implants had lifetime replacement for contralateral breast implants; other Natrelle saline filled implants had only a 10 year warranty for contralateral implants. Beginning June 1, 2009, the Standard warranty was changed to provide for the lifetime replacement of contralateral breast implants for all Natrelle saline filled implants.

**Clayman Defendants**

38.     Loren Z. Clayman was first licensed as a medical doctor in the State of Florida on January 10, 1975.  On December 31, 1976, he completed a residency in plastic surgery, and he began practicing plastic surgery soon afterward in Jacksonville, Florida.  On October 2, 1978, he filed articles of incorporation for Clayman PA, with himself listed as both President and the Registered Agent of the new corporation.

39.     Loren Z. Clayman began performing breast augmentation surgeries as part of his plastic surgery practice.  During the 1980's, a substantial portion of the breast augmentation procedures he performed were with silicone filled breast implants.

40.     After the FDA prohibited the sale of most silicone implants in 1992, Loren Z. Clayman began using saline filled implants almost exclusively.[3]

41.     By 2000, Loren Z. Clayman purchased at least a portion of the saline filled breast implants he used in augmentation procedures from Inamed/McGhan (later Allergan).  The majority (if not all) of saline filled breast implants he purchased from Inamed/McGhan were Natrelle saline filled breast implants.

42.     Before Ms. Akel first consulted with Loren Z. Clayman regarding breast augmentation in 2009, he began making a higher than average number of warranty claims for patients with saline filled implants.  In the vast majority of these claims, Loren Z. Clayman and/or Clayman PA alleged that one or more saline implants spontaneously ruptured/deflated through no fault of the patient or himself.  Furthermore, Loren Z. Clayman and/or Clayman PA began making multiple, successive warranty claims for many of his/their patients.  This practice of Loren Z. Clayman and/or Clayman PA continued during the course of treatment of Ms. Akel.

---

[3]     Silicone filled breast implants could only be used for patients participating in ongoing medical studies, although it is unknown whether any of Loren Z. Clayman's patients participated in the studies.

43.     Even after the FDA once again permitted the sale of silicone filled breast implants in 2006, Loren Z. Clayman and/or Clayman PA continued using saline filled breast implants almost exclusively for breast augmentation procedures.

44.     After June 30, 2008, Loren Z. Clayman's son, Mark Clayman, joined Clayman PA and began practicing plastic surgery, including performing breast augmentation procedures. For patients who received saline filled breast implants, Mark A. Clayman through Clayman PA also began making a higher than average number of warranty claims in which he alleged spontaneous ruptures/deflations through no fault of the patient or him.   Likewise, in many instances, Mark A. Clayman through Clayman PA made multiple, successive warranty claims for patients, and he rarely, if ever, used silicone filled implants for breast augmentation procedures.

45.     <u>Between 2001 and 2015, Clayman PA made warranty claims to Allergan for more than 5,516 pairs of Natrelle saline filled breast implants.</u>

46.     According to Allergan's follow up studies for Natrelle saline filled implants, the rate of spontaneous deflations is approximately 2.7 to 6.8% at 5 years, and approximately 10 to 13.8% at 10 years, averaging roughly 1.2% per year.

47.     Pursuant to 21 C.F.R. §§ 814.80 and 814.82, Allergan has a continuing obligation to evaluate the "safety, effectiveness, and reliability" of medical devices such as Allergan Natrelle saline filled breast implants.   In accordance with these requirements, Allergan performs a *"Laboratory Analysis"* of each returned breast implant to determine the cause of an alleged rupture/deflation, after which a report is generated and maintained.   For the overwhelming majority of saline filled breast implants returned by Clayman PA to Allergan, Allergan found no identifiable causes for the claimed spontaneous ruptures/deflations.

48.    Nevertheless, to the best of the undersigned's knowledge and belief, Allergan paid every one of Clayman PA's warranty claims between 2001 and 2015.

## SUSAN E. AKEL

49.    Ms. Susan E. Akel initially sought a consultation for breast augmentation in connection with a "tummy tuck" from Loren Z. Clayman's office on October 30, 2009. The only note from the visit states, "new pt consultation for breast augmentation & tummy tuck pt will call to schedule." The patient questionnaire form indicated that Ms. Akel was there to discuss a "tummy tuck and breast lift." A surgery cost estimate form indicated a proposal to perform Breast Augmentation (Areola) along with liposuction to the breast for $3,000. There was a separate surgery cost estimate form for abdominoplasty.

50.    There no other details of the initial visit given. Specifically, there is no record of a discussion with her regarding her objectives, the possible alternatives, and counseling with regard to her condition. The medical records also fail to document any detailed description of her current complaints, her desired goal, her family history, her past medical history, her past surgical history, or the medications she was taking. There is also no documented physical examination including dimensional assessment of Ms. Akel's breasts, nor is there a discussion of possible approaches, type or size of implants to be used, or how he intended to address her concerns.

51.    Unbeknownst to Ms. Akel, Loren Z. Clayman, Mark A. Clayman, and Clayman PA had a specific financial incentive to push saline implants on their patients, including Ms. Akel, even when the patient specifically expressed a desire for silicone implants. Loren Z. Clayman, Mark A. Clayman, and Clayman PA had engaged in a scheme with Allergan, the

manufacturer of the saline implants, that they could claim a defect in the saline implants and replace them for their direct financial benefit when no such defect existed. Moreover, Loren Clayman and/or Mark A. Clayman would claim defect of the saline implants and replace them in order to cover up his inadequate surgical skills or haste in performing surgeries on his patients.

52.    Ms. Akel returned to Loren Z. Clayman's office for surgery on November 9, 2009. There is no documented physical examination prior to the surgery, specifically no documented dimensional assessment of Ms. Akel's breasts or any physical findings whatsoever. The History and Physical form in Loren Z. Clayman's chart contains only one mark that purports to be that of Loren Z. Clayman, a single line in the "normal" column of the list of systems. The patient's own note stated that she wanted Loren Z. Clayman to "make them fuller, with a lift."

53.    Ms. Akel advised that she currently wore a size D and desired her breasts to be a "full D, small double D." Loren Z. Clayman's staff recorded on the History and Physical as follows: "36 D → small DD." Ms. Akel further indicated that her breasts sagged and that she wanted to make sure that Loren Z. Clayman knew exactly what she wanted. There is no indication in Loren Z. Clayman's chart that these questions were ever answered, no recognition that she had concerns about their sagging, and no indication that the option(s) for resolving her complaints were considered or discussed with the patient.

54.    There are some undated drawings that were produced as part of Ms. Akel's chart that appear to depict consideration of a donut mastopexy vs. anchor mastopexy. Whether this was used in connection with the initial consultation or at some subsequent time is unknown.

55.    The single preoperative photograph of Susan E. Akel taken by Loren Z. Clayman or his staff dated November 9, 2009 is only a frontal view. Moreover, this frontal view is not in the correct plane to be a true frontal view. In this photograph, however, she demonstrates

moderate to severe Grade III ptosis (sagging), slight asymmetry of the breast structure, and slight asymmetry of the nipple areola complex.

56.     Susan E. Akel underwent breast augmentation surgery by Loren Z. Clayman on November 9, 2009.    The Operative Report indicates that Loren Z. Clayman first performed liposuction "on the breast" through multiple incisions.   The Operative Report does not indicate which breast.    Loren Z. Clayman then entered the breasts through an incision in the areolas and the "patient underwent subpectoral fashion augmentation with 350cc McGhan saline implants." It indicates that there was release of muscle from the sternum. The OR Record further indicates submuscular placement of the implants.

57.     The OR Record indicates that Loren Z. Clayman placed Allergan Natrelle Style 68 High Profile 350cc saline implants bilaterally.   There is no indication as to the amount of saline that was used to inflate either implant.   Loren Z. Clayman did not assess the patient's breasts for symmetry intraoperatively.   The entire procedure lasted only 47 minutes.   The patient was put under intravenous sedation by a registered nurse with Versed, Decadron, and Ketamine.

58.     Ms. Akel returned to Loren Z. Clayman's office on November 12, 2009 for post-operative follow up.   The patient indicated that she had a question "about the pacer (sp ?) and breast size."   The only note for the visit states, "Pt. is seen today 48 hours post-op instructions given on care.   RTO for follow up – 6 weeks."   It is unclear who documented this note but there was no documentation of a physical examination by a physician, no indication how the patient was doing and no indication whether the patient's question(s) was addressed or even recognized. There is no recordation in the medical chart that Ms. Akel was even seen by a physician that day.

59.     Ms. Akel returned to Loren Z. Clayman's office again on February 5, 2010. There is no patient questionnaire or other documentation from the patient regarding this visit.

12

The only note for the visit states, "pt seen w/ co sagging breast pt scheduled for internal lift." It is unclear who documented this note but there was no documentation of a physical examination by a physician, no real indication how the patient was doing and no real description of the patient's condition. There is no recordation that Ms. Akel was even seen by a physician that day. There is a separate surgery cost estimate form that may have been created that day which lists:

- left deflation

- Bilateral Replace

- Internal tightening

to be performed at no charge to the patient since the "co. will provide" for the left deflation and bilateral replacement.

60.    Ms. Akel returned for her first breast surgery revision on February 26, 2010. There is no documented physical examination prior to the surgery, specifically no documented dimensional assessment of Ms. Akel's breasts and no physical findings whatsoever. The patient's assessment was simply that her breasts sagged. Loren Z. Clayman provided the history in the Operative Report as follows:

> She initially presented with sag and asymmetry to breasts and areolas, and did not wish to have mastopexy scars. She underwent augmentation with no issues in the recent past, but presented with recurrent sag and change in size to the left breast. The patient started to notice the change after she started packing as her house went into foreclosure, but noticed it even more after her recent birthday with the way her closes [sic] and bra fit. The patient initially did not want mastopexy scars, but was not requesting an areolar reduction and more liposuction to the sides of her breasts and axilla.

61.    The Authorization and Consent to Surgery states, "left deflation," "Bilateral Replace," "Internal tightening," "Areola Reduction," and "liposuction." The Operative Report lists her preoperative diagnoses as:

1) status post augmentation

13

    2) Left deflation

    3) Large asymmetric areolas and lipodystrophy of axilla and side
    of breasts

Ms. Akel did not have a left deflation.

62.    The History and Physical form in Loren Z. Clayman's chart contains only one entry that purports to be by Loren Z. Clayman, a single line in the normal column of the list of systems. It also records, however, that the patient was currently a size 36 D and wished to remain the same size. Three (3) preoperative photographs taken on the date of surgery demonstrates that the patient significantly asymmetric breast structures, substantially enlarged nipple areola complexes, and asymmetric orientation. There is no evidence of deflation of either saline implant.

63.    According to the Operative Report dated February 26, 2010 Loren Z. Clayman entered each breast through the areola with a surgical cookie cutter to mark the incision. The Report states that the left implant "had a partial deflation with dark tissue in the implant valve." The OR Record likewise records "deflated 4 months, tissue in valve."

64.    The right implant was found intact but nonetheless removed. Loren Z. Clayman replaced both implants with the same size and style (Allergan Natrelle Style 68 High Profile 350 cc saline implants). He recorded filling both implants to 360 ccs. Loren Z. Clayman also recorded that the pockets were tightened laterally, the areolas were reduced and liposuction was performed on the right and left sides. The procedure took 65 minutes. Anesthesia was provided by IV sedation by a registered nurse using Versed, Demerol, and Ketamine.

65.    Loren Z. Clayman reported the left implant to be defective to Allergan prior to the surgery, without any actual evidence of defect and before he had the opportunity to inspect the

implant intraoperatively.[4]   Loren Z. Clayman had Susan E. Akel sign the claim form before the surgery was performed, so that Loren Z. Clayman could be paid.   Loren Z. Clayman subsequently filed a warranty claim to Allergan for the left implant that he removed on February 26, 2010.  In the paperwork he completed and sent to Allergan, Loren Z. Clayman reported that there were "[p]articles in valve." [5]      After examining the returned left implant, Allergan documented in a *Laboratory Analysis* report that there were no findings to substantiate a spontaneous saline implant deflation.  Specifically, the Laboratory Analysis found,

> Brown particles were observed on the inner and outer surfaces of the implant.  Brown particles were observed in the fill channel.  The particles were removed and valve functioning was then satisfactory.  The analysis identified no openings in the implant.

Despite this, Allergan paid Loren Z. Clayman and Clayman PA the sum of $2,400 for the surgery of February 26, 2010.

66.     Ms. Akel returned to Loren Z. Clayman's office on March 1, 2010 for post-operative follow up.   The only note for the visit states, "Discussed more lift with pt, current post op look is excellent with good NAC position & symmetry, Pt would like more upper pole fullness & is well aware of the downside of pexy/lift scars, but would like mr (sp?)."  It is unclear who documented this note but it may have been Mark A. Clayman.  However, there was no documentation of a physical examination by a physician and no real description of her condition.

67.     It appears that at or about this time the care and treatment of Susan Akel was transferred to Mark A. Clayman, M.D. instead of Loren Z. Clayman, M.D.

---

[4] The Returned Goods Authorization (RGA) Checklist for Saline Devices (the claim form) was dated February 26, 2010, the day of surgery and received in Loren Z. Clayman's office via facsimile on that same day.

[5] These were the same defects Loren Z. Clayman reported in virtually every warranty claim submitted to Allergan.

68.    Ms. Akel returned to Clayman PA's office again on March 30, 2010. There is no patient questionnaire for this visit. The only note for the visit states, "long discussion, wants full cleavage and upper pole fullness, wants lift scars, aware of poor healing possible." It is unclear who documented this note but it may have been done by Mark A. Clayman. However, there was no documentation of a physical examination by a physician, no real indication how the patient was doing and no indication whether the options for addressing the patient's concerns were discussed or considered. It is not clear if Ms. Akel was even seen by a physician that day.

69.    Ms. Akel returned to Mark A. Clayman's office again on April 28, 2010. The patient questionnaire for this visit is blank. There are no notes from Mark A. Clayman or his staff regarding this visit. Specifically, there was no documentation of a physical examination by a physician, no indication how the patient was doing and no indication of her problems or concerns and no indication whether the options for addressing the patient's concerns were discussed or considered. There is no recordation in the medical chart that Ms. Akel was even seen by a physician that day. There is a separate surgery cost estimate form that indicates that a mastopexy will be performed at no cost to the patient. Surgery was scheduled for August 25, 2010.

70.    Ms. Akel apparently did not return for the scheduled surgery on August 25, 2010 but returned to Mark A. Clayman's office again on September 3, 2010. The patient questionnaire for this visit is blank. The only note for the visit states, "long discussion about mastopexy again. Pt aware that the scarring will not be nice from anchor cuts & will likely lose nipple sensation & still no guarantee of symmetry b/w breast. Pt also with wt gain since last visit will lose weight & re-eval 1-2 months." It is unclear who documented this note but it may have been by Mark A. Clayman. However, there was no documentation of a physical examination by

16

a physician, no real description of the patient's condition and no indication whether the options for addressing the patient's concerns were discussed or considered.

71.    Ms. Akel returned to Mark A. Clayman's office again on February 2, 2011. There is no patient questionnaire for this visit. The only note for the visit states, "Pt return after 30 + lb wt loss, Δ's to Right breast, want higher & fuller. Pt aware that the breasts will never be high on her chest, even with classic T-scar. Right deflation, plan for replacement with internal tightening & donut mastopexy.   Pt aware of how scar will look & limits of procedure." It is unclear who documented this note but it may have been done by Mark A. Clayman. However, there was no documentation of a physical examination by a physician, no real indication of the patient's current condition, and whether other options for addressing the patient's concerns were discussed or considered. There is a separate surgery cost estimate form that indicates that a bilateral circle mastopexy with replacement of implants will be performed at no cost to the patient. Surgery was scheduled for March 16, 2011.

72.    Instead of undergoing the mastopexy surgery as scheduled on March 16, 2011, there apparently was a phone call between Ms. Akel and Mark A. Clayman on that day.   It appears that the following note was written by Mark A. Clayman documenting that phone call:

> Phone discussion with pt.  Asked pt to find a picture of a pt on the internet who was similar to her breast & look she liked several months ago to make sure she had realistic expectations.  She emailed a picture of a woman with small breasts high on her chest.  I informed Susan that her anatomy will not allow that look.  She's aware that her breasts will stay at the position on her chest & the position of the areola/nipple will move  a small amt at best, but will need the implant around (? sp) to current volume to maintain the fullness she likes.   She verbalized her understanding & all questions were answered.  Surgery as planned Friday. I also informed Susan that if she wasn't realistic about potential outcome, that I will remove the implants for her.

Contained in the chart is a page that has two (2) photographs of women's breasts with a note by

Susan Akel that states:

> Please see the two below pictures of what I would like my breasts
> to look like...I feel that my boobs need to be a small D with a smaller bag
> as my boobs today are way to [sic] big and heavy for me to carry. I also
> want my nipples to be smaller than what they are now. I don't want the
> fake look or the natural look. I want something in between... I will like
> the top of my boobs to have somewhat of a roundness but I don't want the
> hardness or so hard. Hopefully this clear up things... if you have any
> questions please email me or call me. If not I will see you on Friday.

73.     Susan E. Akel returned on March 18, 2011 for her third breast surgery, which was

performed by Mark A. Clayman. The patient questionnaire for the day of surgery merely

indicates that her breasts sagged and that she would like them to remain a size D. There is no

record that Mark A. Clayman discussed her goals or objectives prior to surgery. There is no

indication that Mark A. Clayman ever provided appropriate counseling regarding the size or

structure of her breasts, the asymmetry or position of her breasts, or answered any of her

questions or addressed her concerns.

74.     There is no documented physical examination prior to the surgery of March 18,

2011, specifically no documented dimensional assessment of Ms. Akel's breasts and no physical

findings whatsoever. The History and Physical form in Mark A. Clayman's chart contains only

one mark that purports to be that of Mark A. Clayman, a single line in the "normal" column of

the list of systems. The History and Physical only recognizes one of her goals, to have smaller

breasts.

75.     The preoperative photograph in Mark A. Clayman's chart dated 3/18/2011 does

not show any evidence of deflation of either implant. Instead, the preoperative photograph

demonstrates significant positional asymmetry and malpositioned implants. The nipple areolar

complexes are enlarged, asymmetrical and disoriented. There is no evidence of implant

deflation. Despite this, Mark A. Clayman had the patient sign an Authorization for and Consent to Surgery listing a right deflation as the indication for bilateral replacement of her breast implants.

76. Mark A. Clayman listed "Right deflation" as part of his preoperative diagnosis. Ms. Akel did not have a right implant deflation.

77. Mark A. Clayman proceeded with the third breast surgery on Susan E. Akel on March 18, 2011 with the following preoperative diagnoses:

        1) Post augmentation

        2) Right deflation with recurrent ptosis

        3) Desires areolar reduction

He included a lengthy description in the Operative Report:

> The patient is a 34 year-old female with a 30lb weight loss with new changes to her right breast with increased rippling, small decrease in size and sag noticed after new years. The patient denied any injuries to the breast but was vague on her description of when she noticed the new changes. The patient initially presented with ptotic asymmetric breasts with large asymmetric areolas in 2009. She underwent a donut mastopexy/areola reduction this past year, and developed residual ptosis and some spread of her areolas possibly from a significant weight gain and not wearing supportive bras. Several months ago, she requested an anchor mastopexy and was very vague during her consultations about her desires for a result, as she would discuss wanting both a very natural looking breast and very fake round firm breasts. She was initially very resistant showing me a picture of a look she wanted to achieve, but when we discussed cancelling the procedure; emailed a photo that confirmed her unrealistic expectations based on her starting anatomy and skin quality and this was after five consultations to discuss her options for her desired look. She verbalized her understanding over the phone earlier in the week and again before surgery about her realistic expectations and was aware of the limitations based on her starting anatomy. The patient was interviewed and procedure reviewed again with the patient in the pre-operative area. The patient initially wanted anchor mastopexy scars, but changed her mind and desired the circumareolar reduction procedure with switching to a wider less projecting type of implant and also wanted it softer, aware that she would feel ripples if the implant was not filled to an optimal

capacity.  She was informed again that continued asymmetry would always be present, based on her starting breast anatomy, and that she may still need mastopexy scars in the future due to her desired look.  The risks, complications, and limitations of the procedure were again discussed with the patient based on her starting anatomy.

78.     Mark A. Clayman entered the breasts utilizing the previous areola incisions. Mark A. Clayman first entered the right breast and the implant was "found to have a partial deflation with tissue lodged within the implant valve and particles floating within the remaining implant fluid."  The OR Record states:  "Right tissue & leak @ valve."  The left implant was found intact but removed anyway.  He replaced the 350 cc High Profile implants with 360 cc Moderate Profile implants.  The Operative Report records that the implants were inflated to 340 ccs.  Mark A. Clayman also adjusted the capsules "using nylon suture for the differences, and to internally support the breasts higher and closer to the chest wall."  The areolar reduction was performed using 42 mm cookie cutter.

79.     The entire procedure lasted 60 minutes.  The patient was put under intravenous sedation by a registered nurse with Ketamine, Demerol, and Versed.

80.     Mark A. Clayman reported the right implant to be defective to Allergan prior to the surgery, without any actual evidence of defect and before he had the opportunity to inspect the implant intraoperatively.[6]   Mark A. Clayman had Susan E. Akel sign the claim form on March 18, 2011 before the surgery was performed, so that Mark A. Clayman could be paid. Mark A. Clayman subsequently filed a warranty claim to Allergan for the right implant that he removed on March 18, 2011.[7]  In the paperwork he completed and sent to Allergan, Mark A.

---

[6] The Returned Goods Authorization (RGA) Checklist for Saline Devices (the claim form) was in Clayman PA's office prior to surgery.
[7] The claim form was purportedly signed by Loren Z. Clayman although the surgery was performed by Mark A. Clayman.

Clayman reported that there was a "[h]ole in valve" and/or "[p]articles in valve." [8]    After examining the returned right implant, Allergan documented in a *Laboratory Analysis* report that there were no findings to substantiate a spontaneous saline implant deflation.  Specifically, the Laboratory Analysis found,

> White particles were observed on the inner and outer surface of the implant.  Brown particles were observed in the fill channel.  The particles were removed and valve function was then satisfactory.

Despite this, Allergan paid Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA the sum of $2,400 for the surgery of March 18, 2011.

81.    In a patient form Ms. Akel indicates that she was seen by Mark A. Clayman's office on March 21, 2011.  However, there are no notes or any other record by Mark A. Clayman or his staff that she was seen that day.

82.    Ms. Akel returned for postoperative follow up on March 25, 2011.  There is no indication of any subjective concerns by the patient.  The chart merely indicates, "suture removed, looks great."  The author of this note is unknown but may be Mark A. Clayman.  However, there was no documentation of a physical examination by a physician and no real indication how the patient was doing.

83.    Ms. Akel returned to Mark A. Clayman's office again on April 21, 2011.  There is no indication of any subjective concerns of the patient.  The only note for the visit states, "return check, look great, re-tape ret. 1-2 mon."  It is unclear who documented this note but it may have been Mark A. Clayman.  However, there was no documentation of a physical examination by a physician and no real indication how the patient was doing.

---

[8] These were the same defects Clayman, PA reported in virtually every warranty claim submitted to Allergan.

84.     Susan E. Akel apparently returned to Mark A. Clayman's office on April 22, 2011. There is a single frontal view photograph bearing this date in Mark A. Clayman's chart but no other documentation whatsoever that the patient was present on that date. The photograph demonstrates taped circumareolar incisions. The breasts till appear asymmetrical with the right being higher than the left.

85.     Ms. Akel returned to Mark A. Clayman's office again on May 23, 2011. There is no indication of patient concerns in the patient questionnaire for this visit. The only note for the visit states, "re-tape, look great, with very mild asymmetry. Pt aware that breasts will never be symmetric & would like the [sic] fuller in future." It is unclear who documented this note but it may have been Mark A. Clayman. However, there was no documentation of a physical examination by a physician, no real indication how the patient was doing and no documentation of the asymmetry that was noted.

86.     Susan E. Akel returned on June 24, 2011 for her fourth breast surgery, to be performed by Mark A. Clayman. She did not record any of her concerns or objectives on the patient questionnaires. There is no indication that Mark A. Clayman ever provided appropriate counseling regarding the size or structure of her breasts or their asymmetry. There is no documented physical examination prior to the surgery of June 24, 2011, specifically no documented dimensional assessment of Ms. Akel's breasts and no physical findings whatsoever. The History and Physical form in Mark A. Clayman's chart contains only one mark that purports to be that of Mark A. Clayman, a single line in the "normal" column of the list of systems. The History and Physical does indicate the following: "36 DD → small increase."

87.     Mark A. Clayman listed "Desires larger with increase in volume" as his preoperative diagnosis. The preoperative photograph in Mark A. Clayman's chart (dated

6/24/2011) reveals that the implants are still malpositioned and that the breasts are asymmetrical, with the left being higher than the right. The nipple areolar complexes are still disoriented and pointing in different directions.    Mark A. Clayman included the following description in the Operative Report:

> The patient had previous revision augmentation with areolar reduction with a very nice result from her starting anatomy. She initially wished to be more natural with a softer feel to her breasts, but now desired to have upper pole fullness with more cleavage and mild rippling improved by adding volume. The patient was interviewed and procedure reviewed again with the patient in the pre-operative area. She was aware that increasing volume would make the breasts firmer and rounder. She verbalized her understanding and wished to proceed. She had some mild asymmetries, but was aware she would always have these and did not wish to have any more incisions or scars at this time.

88.    Mark A. Clayman proceeded with Ms. Akel's fourth breast surgery on June 24, 2011 by entering the left breast utilizing the previous areola incisions. Mark A. Clayman recorded that he added 90 cc's saline to both breasts.

89.    Ms. Akel's first postoperative follow up by Mark A. Clayman was on July 1, 2011. The patient questionnaire does not identify any specific concerns or questions. The only note for the visit states, "Pt. seen post-op breast. Sutures removed & steri applied. R.T.O. 1 wk." It is unclear who documented this note but there was no documentation of a physical examination by a physician and no indication of the patient's condition. There is no record that Ms. Akel was seen by a physician.

90.    On July 8, 2011, Susan E. Akel returned to Mark A. Clayman's office. The patient questionnaire does not identify any specific concerns or questions. The only note for the visit states, "ret. check, look good. great symmetry; ret. 6 mo." It is unclear who documented

this note but it may have been Mark A. Clayman.  However, there was no documentation of a physical examination by a physician and no real indication of the patient's condition.

91.    It seems that Ms. Akel may have returned to Mark A. Clayman's office on July 25, 2011.  There is a patient questionnaire filled out by Ms. Akel bearing this date indicating a follow up visit.  However, there is no documentation by Mark A. Clayman or his staff of a visit on this date.

92.    It appears that Ms. Akel may have returned to Mark A. Clayman's office on August 5, 2011.  There is a surgery cost estimate form the purports to be filled out on this date for a bilateral increase to be performed on that same day.  However, there is no documentation by Mark A. Clayman or his staff of a visit on this date and no indication that Ms. Akel underwent the procedure indicated on this date.

93.    It appears that Ms. Akel returned to Mark A. Clayman's office on November 21, 2011 (date unclear).  There is no patient questionnaire or any other record filled out by the patient on this date.  The only note for the visit states, "Pt return for eval.  Still concerned over asymmetry of areola pt aware of limits of procedure & will never be completely even, possible revision NAC in Left in future."  It is unclear who documented this note but it may have been Mark Clayman.  However, there was no documentation of a physical examination by a physician and no indication of the patient's condition.

94.    It appears that Ms. Akel returned to Mark A. Clayman's office on March 23, 2012.  There is a photograph, presumably of Ms. Akel, in Mark A. Clayman's chart bearing this date.  However, there is no documentation by either the patient, Mark A. Clayman or his staff of a visit on that date.

95.    On March 27, 2012 Susan E. Akel returned again to Mark A. Clayman's office. There is no patient questionnaire or any other documents created by the patient on this date. The only note for the visit states, "Pt ret for eval; pt has very nice result & informed pt again that she will never be completely symmetric. Plan left areola revision poss. inc. on Right." It is unclear who documented this note but it may have been Mark A. Clayman. However, there was no documentation of a physical examination by a physician and no indication of the alternatives or options presented to the patient to address her concerns.

96.    On May 24, 2012 Susan E. Akel returned to Mark A. Clayman for her **fifth breast surgery.** Ms. Akel's patient questionnaires were almost blank but indicated that her breasts sagged, "a little." There is no indication that Mark A. Clayman ever provided appropriate counseling regarding the size or structure of her breasts, their continued asymmetry, or answered any of her questions or addressed her concerns.

97.    There is no documented physical examination prior to the surgery of May 24, 2012, specifically no documented dimensional assessment of Ms. Akel's breasts and no physical findings whatsoever. The History and Physical form in Mark A. Clayman's chart contains only one mark that purports to be that of Mark A. Clayman, a single line in the "normal" column of the list of systems. The Operative Report includes following description:

> The patient has a very nice result from where she started with significant ptosis and asymmetry of her breasts with large asymmetric nipple areolar complexes. She initially wanted the breasts to be soft and natural, but now continues to return requesting more volume to be added to the implants, desiring a fuller rounder and firmer look. The patient was interviewed and procedure reviewed again with the patient in the pre-operative area. A long discussion over the firmness that would result from adding more volume as the patient requested. The patient desired a significant increase, over 200cc's, and requested making her left areola smaller to match the right. I reviewed the risks with increasing volume and risk of areolar spread with the increased tension. She is aware that the areolas and her breasts will always be different and we have discussed this on multiple occasions. She has currently has very good nipple sensation, confirming that it is even better than

> when she started, but was aware of loss of sensation with repeated surgery around the areolas. I also reviewed with the patient that increasing her 50-100 cc's would be the maximum and reviewed the risks again with her desired fullness.

There is no preoperative photograph depicting the condition of Ms. Akel's breasts.

98.    Mark A. Clayman proceeded with the **fifth breast surgery** on May 24, 2012 utilizing the previous areola incision. Mark A. Clayman recorded that he added 90 cc's saline to each implant. He then measured the areolas bilaterally and left circumareolar scar revision was performed on the left to match the size of the right.

99.    Ms. Akel returned for follow up again the next day, on May 25, 2012. No specific complaints are noted on the patient questionnaire. The chart merely indicates, "return check, NAC intact, ret. 2-3 wks." There was no documentation of a physical examination by a physician and no documentation of the patient's subjective assessment of her condition.

100.    On June 8, 2012, Susan E. Akel returned to Mark A. Clayman's office. The patient questionnaire does not note any specific complaints. The chart merely indicates "Pt return now with swelling on left breast, not present 24 hours after surgery during f/u visit. Pt denies trauma to breast, pt will ice and ret 1 wk." The author of this note is unknown but it appears to be Mark Clayman.

101.    Susan E. Akel returned to Mark A. Clayman's office on June 29, 2012. No specific complaints are noted on the patient questionnaire. The chart merely indicates "doing well, ret for re-tape in future." The author of this note is unknown but it appears to be Mark Clayman. However, there was no documentation of a physical examination by a physician and no real indication how the patient was doing.

102.    Ms. Akel returned on July 21, 2012. There is no patient questionnaire for this visit. The note in Mark A. Clayman's chart merely states, "return check, deep sutures spit,

26

otherwise doing well, removed return 2-3 wk or pt will call if any problems." It is unclear who documented this note but it may have been Mark Clayman. However, there was no documentation of a physical examination by a physician.

103.    Ms. Akel returned to Mark A. Clayman's office on July 26, 2012. There is no patient questionnaire for this visit. The only note states, "internal suture spit, removed. f/u prn." It is unclear who documented this note but it may have been Mark Clayman. However, there was no documentation of a physical examination by a physician.

104.    During one or more of her visits to Clayman PA, Loren Z. Clayman examined the patient without a chaperone, made improper anatomical references, called her breasts "titties" or "tits," and "handled" her breasts with his body positioned behind and against hers while examining her as she faced a mirror. Loren Z. Clayman did not wear gloves during the examinations.

105.    After July 26, 2012, Susan E. Akel left the care of Clayman Plastic Surgery. After five (5) surgeries at the hands of Loren Z. Clayman and Mark A. Clayman, Ms. Akel's implants remained malpositioned, asymmetrical, painful, and demonstrated a poor aesthetic appearance. She has significant scarring and tissue damage.

## COUNT I –MEDICAL NEGLIGENCE OF LOREN Z. CLAYMAN

106.    Ms. Akel re-alleges and incorporates by reference paragraphs 1 through 105.

107.    At all times material, Loren Z. Clayman owed Ms. Akel a duty to exercise that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was recognized as acceptable and appropriate by reasonably careful physicians caring for a patient such as Ms. Akel.

108.    On or between October 30, 2009 and July 26, 2012, Loren Z. Clayman and/or Clayman PA fell below the accepted and/or applicable standard of care in the treatment of Ms. Akel in one or more of the following ways:

A.    Loren Z. Clayman's office notes throughout Ms. Akel's care are grossly inadequate. None of the consultations or follow-up care contains any direct documentation by Loren Z. Clayman of their encounters.  It is unclear if there is any direct documentation of assessment at any time by Loren Z. Clayman other than the operative report. At a minimum, documentation should reflect the patient's subjective concerns, a review of pertinent medical history, physical assessments including direct measurements, and a synopsis of findings leading to the surgical recommendation. Specifically, there was no discussion at the initial preoperative visit that Ms. Akel had pre-existing asymmetry or any other condition that would limit her expected or likely results of breast surgery.

B.    In the records of Loren Z. Clayman, M.D., no discussion of implant size is documented.  Patients should have the opportunity to try different size implants and have a documented discussion regarding incision placement, tissue plane (pre/subpectoral), implant type, and implant size.  In Ms. Akel's records, there are no such discussions.

C.    It is the generally accepted standard of care to take basic measurements of breast dimensions to appropriately guide and help select the optimal implant size for a given patient's breast and chest size.  There is no documentation of any breast measurements that would have helped a prudent surgeon pick an appropriately sized implant for this patient based on commonly accepted dimensional planning concepts.

There is no documented discussion regarding implant volume or evidence that there was an attempt to size the patient appropriately prior to proceeding with surgery.

D.      The office notes do not contain detailed physical examinations, detailed assessments/plans, or detailed documentation of the informed consent process.  Lack of appropriate documentation of follow-up visits is also a serious concern.  No physician assessments or specific plans of care are documented.

E.      Loren Z. Clayman failed to conduct adequate physical examinations of the patient and, on the day of surgery, failed to conduct any physical examination at all.

F.      The photographic documentation in Ms. Akel's medical records is inadequate.  At the very minimum, antero-posterior, lateral and oblique views should be obtained.  Standardization of photo background, lighting, height, and distance is also important and considered standard of care as it allows not only a means of further objective assessment of the problem, but also a means of comparison over time.  The few photos in the records are poorly reproduced "Polaroids" that only show a frontal view. The lack of adequate, standardized photographic documentation is very likely deliberate so that Loren Z. Clayman can continue to claim evidence of implant deflation when no such evidence exists.

G.      Loren Z. Clayman failed to correct the persistent malposition and sagging by placing the implants on a higher position on the chest wall in combination with a mastopexy at some point during the course of care of Ms. Akel.  Throughout the course of care and treatment the malposition, sagging, and asymmetry of the implants were the patient's primary concern.  However, Loren Z. Clayman never adequately addressed these concerns.    Rather than consider the patient's individual wishes and physical

characteristics, Loren Z. Clayman choose to proceed with his universal, "one size fits all" approach: placement of a high profile, overfilled saline implant through an areolar incision. By failing to offer repositioning of the implants in combination with a mastopexy at some point during the course of her treatment, Loren Z. Clayman had little to no chance of meeting Ms. Akel's reasonable expectations of improving the appearance of her breasts and giving her the appearance she desired.

H.    Instead of placing an implant of an appropriate size and projection in combination with repositioning the implants together with a standard mastopexy, the patient's condition was only exacerbated by subsequent surgeries that failed to address the primary problem. By failing to include these options and perform these procedures in Ms. Akel's treatment plan, she was "started down a road" of repetitive, ineffectual operations that could have been avoided had they been performed in combination with appropriately sized implants chosen using commonly accepted dimensional planning concepts. Instead, Loren Z. Clayman simply claimed deflation and replaced the implants, hoping for a better result but failing to provide the appropriate procedure to obtain the best possible result for the patient. Ms. Akel's current complaints and persistent deformities were set in motion by poor preoperative counseling and assessment, as well as intraoperative execution from the time of the first surgery.

I.    In addition to the failure to perform the procedures noted above, Loren Z. Clayman exacerbated the patient's malpositioning, asymmetry, ptosis (sagging), and areolar size by placement of the overfilled, high profile implants. Prolonged malposition in the lower pole location and worsening ptosis with widened areola diameter resulted in

excessive and irreversible expansion of the lower poles that could only be corrected through extensive internal capsule work or formal mastopexy procedure.

J.    Silicone gel implants should have been offered or at least considered after the first and subsequent surgeries. The benefits of switching to the silicone implants include a negligible risk of implant rupture and deflation, as well as a softer, less painful, and more natural feel without rippling compared to overfilled saline implants.

K.    Many of Ms. Akel's problems can be traced to grossly overfilling the saline implants placed by Loren Z. Clayman. Overfilling saline implants frequently leads to excessive firmness or hardness of the entire breast and discomfort. It can additionally lead to capsular contracture. Ms. Akel's implants were hard and uncomfortable which appear to be directly related to filling the implants beyond their recommended capacity. Filling the implants greater than 10% maximum overfill is a recognized cause of failure of the valve, leakage, and ultimately deflation of the implant. Moreover, the sheer volume of augmentation used magnified the preexisting asymmetries of the breasts resulting in a worse appearance aesthetically.

L.    It is apparent that Loren Z. Clayman failed to measure and/or record the amount of saline used to inflate the implant(s) on each occasion. Instead, Loren Z. Clayman merely estimated the amount of saline used. Measuring the amount of saline that is used allows the physician to make appropriate adjustments if subsequent breast revision surgeries are made based on a quantitative analysis rather than merely guessing the amount of saline necessary to achieve symmetry and equal size. Here, that failure contributed to size disparity and grossly overfilling the saline implants. Overfilling a saline implant far beyond the manufacturer's recommendation causes excessive firmness

and discomfort. Moreover, it frequently leads to sagging, malposition, and the creation of over-sized areola

M.    Loren Z. Clayman used improper surgical technique in the initial breast augmentation surgery on November 9, 2009. Loren Z. Clayman entered the breasts through a superior areolar incision. Instead, he should have made the incision at the inferior aspect of the areola at the junction between the pigmented areolar skin and non-pigmented lower pole breast skin. Loren Z. Clayman's approach made it difficult to obtain adequate positioning and placement of the implants in the lower part of the breast and into the subpectoral plane. This contributed to the flat appearance at that part of the breast and contributes to greater risk to lactation potential and nipple sensation.

N.    Loren Z. Clayman improperly replaced implants bilaterally when only the allegedly deflated saline implant should have been replaced. To the extent that the surgery of February 26, 2010 was indicated at all, it was indicated for the removal and replacement of only the implant suspected of deflation, not both implants.

O.    Loren Z. Clayman never adequately answered the patient's questions or provided appropriate information to obtain appropriate informed consent for the surgical procedures conducted.

P.    The type and quality of anesthesia provided to Ms. Akel to perform the initial purported subpectoral breast augmentation and subsequent revisions was inadequate and improper. Loren Z. Clayman, M.D. used the sedation protocol of ketamine and versed, which was administered by a registered nurse. This led to significant under-sedation, which was evident in this case. Intravenous sedation should be deep enough to adequately perform the procedure without the patient being able to

hear conversations, recall the procedure, or remember waking up during the surgery. Moreover, the anesthetic regimen continued to be administered despite its insufficiency and the adverse complications experienced by the patient.

Q.    It is very likely that the implants were difficult to position under the pectoralis major muscle due to inadequate muscle paralysis.  Subpectoral implants may be placed under intravenous sedation provided that a proper pectoralis block is performed to adequately relax the muscle in combination with rib blocks for optimal pain control. There is no evidence that this was performed during any of Ms. Akel's surgeries, contributing further to her breast ptosis (sagging), asymmetry, and malpositioning. The inadequate intravenous sedation during Ms. Akel's procedures more likely than not lead to an inadequate subpectoral plane and pocket development, and likely caused or contributed to the implants being malpositioned.

R.    General anesthesia should have been used, especially for the revisionary procedures because they were significantly more involved than her initial breast augmentation procedure and because of the history of inadequate sedation and adverse reactions suffered by the patient.  More likely than not, Loren Z. Clayman, M.D. took into account the limitations of intravenous sedation when he performed the revision surgeries, and there was no legitimate medical justification for choosing intravenous sedation administered by a registered nurse for these procedures.  It appears that Loren Z. Clayman, M.D. chose this approach merely to control costs and in this particular case, as another excuse to avoid performing a formal mastopexy.

S.    Loren Z. Clayman improperly placed his desires, the prospect of direct financial gain for replacing allegedly defective implants, above the preferences and

33

desires of the patient. Although silicone implants would have been appropriate for this patient, Loren Z. Clayman improperly insisted on the use of saline implants.

T.    The removal and replacement of Ms. Akel's implants on February 26, 2010 due to an alleged deflation was, at a minimum, an extreme deviation from the standard of care. There was no photographic evidence of implant deflation, no patient complaints indicative of implant deflation, and no evidence of implant failure upon examination of the explanted saline device by Allergan. Allergan's implant follow-up studies show spontaneous saline implant deflation rates of only approximately 2.7 to 6.8% at 5 years, and approximately 10 to 13.8% at 10 years, averaging roughly 1.2% per year. Ms. Susan E. Akel did not have an implant deflation.

U.    By repeatedly operating on this patient and claiming that her implants had deflated, Loren Z. Clayman placed her at an increased and unnecessary risk for surgical and anesthetic complications. These surgeries could have been avoided had Loren Z. Clayman used appropriately sized implants, placed them in an appropriate position, and provided other appropriate care as outlined above in conjunction with the first operation.

V.    Loren Z. Clayman concealed or intentionally misrepresented the cause of the patient's post-surgical results and subsequent complaints by claiming spontaneous deflations.

W.    Loren Z. Clayman failed to act in a professional manner. Loren Z. Clayman examined the patient without a chaperone, made improper anatomical references, called her breasts "titties" or "tits," and "handled" her breasts with his body positioned behind and against hers while examining her as she faced a mirror. These actions are entirely unprofessional and a breach of the standard of care.

34

109.    As a direct and proximate result of above noted breach or breaches of the standard of care by Loren Z. Clayman and/or Clayman PA, Ms. Akel suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

110.    Furthermore, on one or more occasions Loren Z. Clayman and/or Clayman PA fraudulently concealed or intentionally misrepresented to Ms. Akel and/or others that a saline implant that had been implanted in her body spontaneously deflated or ruptured; such fraud, concealment, or intentional misrepresentation caused Ms. Akel to conclude that the problems she was having with her breasts were the result of product defects rather than the result of breaches of the applicable standard of care by Loren Z. Clayman and/or Clayman PA.

WHEREFORE, the Plaintiff SUSAN E. AKEL demands judgment for damages against the Defendants LOREN Z. CLAYMAN, M.D. and LOREN Z. CLAYMAN, M.D., P.A. together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT II –MEDICAL NEGLIGENCE OF MARK A. CLAYMAN

111.    Ms. Akel re-alleges and incorporates by reference paragraphs 1 through 105.

112.    At all times material, Mark A. Clayman owed Ms. Akel a duty to exercise that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was recognized as acceptable and appropriate by reasonably careful physicians caring for a patient such as Ms. Akel.

113.    On or between October 30, 2009 and July 26, 2012, Mark A. Clayman and/or Clayman PA fell below the accepted and/or applicable standard of care in the treatment of Ms. Akel in one or more of the following ways:

A.    Mark A. Clayman's office notes throughout Ms. Akel's care are grossly inadequate. At a minimum, documentation should reflect the patient's subjective concerns, a review of pertinent medical history, physical assessments including direct measurements, and a synopsis of findings leading to the surgical recommendation.

B.    In the records of Mark A. Clayman, M.D., no discussion of implant size is documented. Patients should have the opportunity to try different size implants and have a documented discussion regarding incision placement, tissue plane (pre/subpectoral), implant type, and implant size. In Ms. Akel's records, there are no such discussions.

C.    It is the generally accepted standard of care to take basic measurements of breast dimensions to appropriately guide and help select the optimal implant size for a given patient's breast and chest size. There is no documentation of any breast measurements that would have helped a prudent surgeon pick an appropriately sized implant for this patient based on commonly accepted dimensional planning concepts. There is no documented discussion regarding implant volume or evidence that there was an attempt to size the patient appropriately prior to proceeding with surgery.

D.    The office notes do not contain detailed physical examinations, detailed assessments/plans, or detailed documentation of the informed consent process. Lack of appropriate documentation of follow-up visits is also a serious concern. No physician assessments or specific plans of care are documented.

36

E.      Mark A. Clayman failed to conduct adequate physical examinations of the patient and, on the day of surgery, failed to conduct any physical examination at all.

F.      The photographic documentation in Ms. Akel's medical records is inadequate. At the very minimum, antero-posterior, lateral and oblique views should be obtained. Standardization of photo background, lighting, height, and distance is also important and considered standard of care as it allows not only a means of further objective assessment of the problem, but also a means of comparison over time. The few photos in the records are poorly reproduced "Polaroids" that only show a frontal view. The lack of adequate, standardized photographic documentation is very likely deliberate so that Mark A. Clayman can continue to claim evidence of implant deflation when no such evidence exists.

G.      Mark A. Clayman failed to correct the persistent malposition and sagging by placing the implants on a higher position on the chest wall in combination with a mastopexy at some point during the course of care of Ms. Akel. Throughout the course of care and treatment the malposition, sagging, and asymmetry of the implants were the patient's primary concern. However, Mark A. Clayman never adequately addressed these concerns.      Rather than consider the patient's individual wishes and physical characteristics, Mark A. Clayman choose to proceed with his universal, "one size fits all" approach: placement of a high profile, overfilled saline implant through an areolar incision. By failing to offer repositioning of the implants in combination with a mastopexy at some point during the course of her treatment, Mark A. Clayman had little to no chance of meeting Ms. Akel's reasonable expectations of improving the appearance of her breasts and giving her the appearance she desired.

H.      Instead of placing an implant of an appropriate size and projection in combination with repositioning the implants together with a standard mastopexy, the patient's condition was only exacerbated by subsequent surgeries that failed to address the primary problem.  By failing to include these options and perform these procedures in Ms. Akel's treatment plan, she was "started down a road" of repetitive, ineffectual operations that could have been avoided had they been performed in combination with appropriately sized implants chosen using commonly accepted dimensional planning concepts.  Instead, Mark A. Clayman simply claimed deflation and replaced the implants, hoping for a better result but failing to provide the appropriate procedure to obtain the best possible result for the patient.   Ms. Akel's current complaints and persistent deformities were set in motion by poor preoperative counseling and assessment, as well as intraoperative execution.

I.      In addition to the failure to perform the procedures noted above, Mark A. Clayman exacerbated the patient's malpositioning, asymmetry, ptosis (sagging), and areolar size by placement of the overfilled, high profile implants. Prolonged malposition in the lower pole location and worsening ptosis with widened areola diameter resulted in excessive and irreversible expansion of the lower poles that could only be corrected through extensive internal capsule work or formal mastopexy procedure.

J.      Silicone gel implants should have been offered or at least considered for the March 18, 2011 surgery.  The benefits of switching to the silicone implants include a negligible risk of implant rupture and deflation, as well as a softer, less painful, and more natural feel without rippling compared to overfilled saline implants.

K.    Many of Ms. Akel's problems can be traced to grossly overfilling the saline implants placed by Mark A. Clayman. Overfilling saline implants frequently leads to excessive firmness or hardness of the entire breast and discomfort. It can additionally lead to capsular contracture. Ms. Akel's implants were hard and uncomfortable which appear to be directly related to filling the implants beyond their recommended capacity. On March 18, 2011 Mark A. Clayman placed 360 cc saline implants into Ms. Akel which were purportedly filled to 340 cc's. On June 24, 2011 he recorded adding 90 cc's of saline, which would have resulted in 430 cc's in a 360 cc saline implant. On May 24, 2012 he recorded adding another 90 cc's of saline, which would have resulted in 520 cc's in a 360 cc saline implant. Filling the implants greater than 10% maximum overfill is a recognized cause of failure of the valve, leakage, and ultimately deflation of the implant. Moreover, the sheer volume of augmentation used magnified the preexisting asymmetries of the breasts resulting in a worse appearance aesthetically.

L.    Mark A. Clayman failed to measure and/or record the amount of saline used to inflate the implant(s) on each occasion. Instead, Mark A. Clayman merely estimated the amount of saline used. Measuring the amount of saline that is used allows the physician to make appropriate adjustments if subsequent breast revision surgeries are made based on a quantitative analysis rather than merely guessing the amount of saline necessary to achieve symmetry and equal size. Here, that failure contributed to size disparity and grossly overfilling the saline implants. Overfilling a saline implant far beyond the manufacturer's recommendation causes excessive firmness and discomfort. Moreover, it frequently leads to sagging, malposition, and the creation of over-sized areola

M.      Mark A. Clayman improperly replaced implants bilaterally when only the allegedly deflated saline implant should have been replaced.  To the extent that the surgery of March 18, 2011 was indicated at all, it was indicated for the removal and replacement of only the implant suspected of deflation, not both implants.

N.      Mark A. Clayman never adequately answered the patient's questions or provided appropriate information to obtain appropriate informed consent for the surgical procedures conducted.

O.      The type and quality of anesthesia provided to Ms. Akel to perform the initial purported subpectoral breast augmentation and subsequent revisions was inadequate and improper.  Mark A. Clayman, M.D. used the sedation protocol of ketamine and versed, which was administered by a registered nurse.  This led to significant under-sedation, which was evident in this case.  Intravenous sedation should be deep enough to adequately perform the procedure without the patient being able to hear conversations, recall the procedure, or remember waking up during the surgery. Moreover, the anesthetic regimen continued to be administered despite its insufficiency and the adverse complications experienced by the patient.

P.      It is very likely that the implants were difficult to position under the pectoralis major muscle due to inadequate muscle paralysis.  Subpectoral implants may be placed under intravenous sedation provided that a proper pectoralis block is performed to adequately relax the muscle in combination with rib blocks for optimal pain control. There is no evidence that this was performed during any of Ms. Akel's surgeries, contributing further to her breast ptosis (sagging), asymmetry, and malpositioning. The inadequate intravenous sedation during Ms. Akel's procedures more likely than not lead

to an inadequate subpectoral plane and pocket development, and likely caused or contributed to the implants being malpositioned.

Q.      General anesthesia should have been used, especially for the surgery of March 18, 2011 because it was significantly more involved than her initial breast augmentation procedure and because of the history of inadequate sedation and adverse reactions suffered by the patient. More likely than not, Mark A. Clayman, M.D. took into account the limitations of intravenous sedation when he performed the revision surgeries, and there was no legitimate medical justification for choosing intravenous sedation administered by a registered nurse for these procedures. It appears that Mark A. Clayman, M.D. chose this approach merely to control costs and in this particular case, as another excuse to avoid performing a formal mastopexy.

R.      Mark A. Clayman improperly placed his desires, the prospect of direct financial gain for replacing allegedly defective implants, above the preferences and desires of the patient. Although silicone implants would have been appropriate for this patient, Mark A. Clayman improperly insisted on the use of saline implants.

T.      The removal and replacement of Ms. Akel's implants on March 18, 2011 due to an alleged deflation was, at a minimum, an extreme deviation from the standard of care. There was no photographic evidence of implant deflation, no patient complaints indicative of implant deflation, and no evidence of implant failure upon examination of the explanted saline device by Allergan. Allergan's implant follow-up studies show spontaneous saline implant deflation rates of only approximately 2.7 to 6.8% at 5 years, and approximately 10 to 13.8% at 10 years, averaging roughly 1.2% per year. Ms. Susan E. Akel did not have an implant deflation.

41

U.     By operating on this patient on March 18, 2011 claiming that her implant had deflated, Mark A. Clayman placed her at an increased and unnecessary risk for surgical and anesthetic complications. This surgery, and the subsequent surgeries could have been avoided had Mark A. Clayman used appropriately sized implants, placed them in an appropriate position, and provided other appropriate care as outlined above in conjunction with the first operation.

114.     Mark A. Clayman concealed or intentionally misrepresented the cause of the patient's post-surgical results and subsequent complaints by claiming spontaneous As a direct and proximate result of above noted breach or breaches of the standard of care by Mark A. Clayman and/or Clayman PA, Ms. Akel suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

115.     Furthermore, on one or more occasions Mark A. Clayman and/or Clayman PA fraudulently concealed or intentionally misrepresented to Ms. Akel and/or others that a saline implant that had been implanted in her body spontaneously deflated or ruptured; such fraud, concealment, or intentional misrepresentation caused Ms. Akel to conclude that the problems she was having with her breasts were the result of product defects rather than the result of breaches of the applicable standard of care by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA.

WHEREFORE, the Plaintiff **SUSAN E. AKEL** demands judgment for damages against the Defendants **MARK A. CLAYMAN, M.D.** and **LOREN Z. CLAYMAN, M.D., P.A.** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT III – CLAYMAN DEFENDANTS' BREACH OF FIDUCIARY DUTY

116.    Ms. Akel re-alleges and incorporates by reference paragraphs 1 through 105, 108 and 113.

117.    On or between October 30, 2009 and July 26, 2012, Ms. Akel was a patient of Loren Z. Clayman and Mark A. Clayman. By virtue of the physician-patient relationship, Loren Z. Clayman, Mark A. Clayman, and Clayman PA had a fiduciary duty to Ms. Akel to not perform acts for his/their own pecuniary gain that were contrary to her welfare.

118.    Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA violated this fiduciary duty to Ms. Akel in one or more of the following ways:

(a).    By recommending or insisting on Allergan saline implants based on their direct financial motivation rather than making appropriate recommendations based on the best interest of the patient.

(b).    By repeatedly claiming that her breast implants had deflated when in fact they had not.

(c).    By repeatedly operating on Ms. Akel, which placed her at an increased risk for surgical and anesthetic complications, yet simply repeating the same procedures that were previously performed.

(d).    By repeatedly not performing the surgery that her physical condition actually required, as described above, in favor of surgery that took less time and skill, to save Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA time and money.

(e).    By repeatedly operating on her when he knew or should have known that he did not have the skill or competency to perform the surgeries within the standard of care.

(f).    By repeatedly operating on her so that Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA could recover a surgical fee from Allergan each time.

(g).    By performing surgery with inadequate anesthesia because it was cheaper, which in turn led to improper implant placement as well as increased pain, discomfort, and anxiety.

119.    Furthermore, on one or more occasions Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA fraudulently concealed or intentionally misrepresented to Ms. Akel and/or others that a saline implant that had been implanted in her body had spontaneously deflated; such fraud, concealment, or intentional misrepresentation caused Ms. Akel to conclude that the problems she was having with her breasts were the result of product defects rather than the result of breaches of Loren Z. Clayman and Mark A. Clayman's fiduciary duties to her.

120.    As a direct and proximate result of Loren Z. Clayman's, Mark A. Clayman's, and/or Clayman PA's breaches of fiduciary duties to Ms. Akel, she suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

WHEREFORE, the Plaintiff **SUSAN E. AKEL** demands judgment for damages against the Defendants **LOREN Z. CLAYMAN, M.D., MARK A. CLAYMAN, M.D.,** and **LOREN Z. CLAYMAN, M.D., P.A.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT IV – CLAYMAN DEFENDANTS' VIOLATIONS OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

121. Ms. Akel re-alleges and incorporates by reference paragraphs 1 through 105.

122. On one or more occasions between October 30, 2009 and July 26, 2012, Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA, engaged in one or more of the following acts:

(a).    Caused or allowed to be printed, published, or otherwise disseminated to the general public advertisements soliciting patients for "Dr. Clayman's Plastic Surgery Center & Miracle Spa" when there is no organized entity or even a registered fictitious name for such an entity or organization.

(b).    Caused or allowed to be printed, published, or otherwise disseminated to the general public advertisements that represented that Loren Z. Clayman and Mark A. Clayman had the experience, competence and finesse to produce extraordinary surgical results, when in fact such representations were false.

(c).    Represented to Ms. Akel and/or others that a saline implant that had been implanted in her had spontaneously ruptured or deflated, when in fact it had not.

(d).    Represented to Ms. Akel and/or others that Allergan saline implants were in the best interest of the patient, and the best choice for the patient to obtain the desired results, when, in fact, they were not.

123.    The aforementioned acts of Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA were "[u]nfair methods of competition, unconscionable acts or practices, or unfair or deceptive practices" as contemplated by Section 501.204, *Florida Statutes*.

124.    Ms. Akel is a "consumer" and Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA were and are engaged in "trade or commerce," as both terms are defined in Section 501.203 (7) and (8), Florida Statutes.

125.    As a direct and proximate result of the aforesaid acts of Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA, Ms. Akel suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

126.    Furthermore, as a direct and proximate result of the aforesaid acts of Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA, Ms. Akel spent monies in the amount of $3,750 or more, for medical and/or surgical care by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA that was of no value, and which caused her to need future medical care and incur related expenses to correct the damages done by said past medical and/or surgical care of Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA.

127.    As a result of the aforesaid acts of Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA, Ms. Akel has retained or employed the undersigned law firm, and she has agreed to pay the firm a reasonable fee for its services in that regard.

WHEREFORE, the Plaintiff SUSAN E. AKEL seeks the following relief:

(a).    Judgment for damages against the Defendants LOREN Z. CLAYMAN, M.D.,

**MARK A. CLAYMAN, M.D., and/or  LOREN Z. CLAYMAN, M.D., P.A.**

(b).    The court costs of this action, and attorney's fees pursuant to Sections 501.2105 and 501.211(2), *Florida Statutes*.

(c).    A declaratory judgment that one or more acts or practices of one or more of the Defendants violated the *Florida Deceptive and Unfair Trade Practices Act*.

(d).    An order enjoining one or more of the Defendants from engaging in the above noted acts or practices.

(e).    The Plaintiff further demands a trial by jury on all issues so triable.

## COUNT V – CLAYMAN DEFENDANTS' FRAUD

128.    Ms. Akel re-alleges and incorporates by reference paragraphs 1 through 105.

129.    On one or more of the below occasions, Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA made the following false statements or representations, which were intended to conceal his inability to perform the breast augmentation procedures competently and within the standard of care, and which in fact misled Ms. Akel and/or caused her to respond in the following ways to her detriment:

(a).    On February 5, 2010, Loren Z. Clayman told Ms. Akel that her left breast implant was deflated and needed to be replaced.  In fact, Ms. Akel did not have a left implant deflation, rupture, or leak, and he did not have the intention or ability to correct the actual problems with her breasts.  These representations caused Ms. Akel to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another

surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. Akel did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(b). In a surgical estimate prepared on February 5, 2010, Loren Z. Clayman represented to Ms. Akel that her left breast implant was deflated and needed to be replaced. In fact, Ms. Akel did not have a left implant deflation, rupture, or leak, and he did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Akel to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. Akel did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(c). In the informed consent dated February 26, 2010, Loren Z. Clayman represented to Ms. Akel that her left breast implant was deflated and needed to be replaced. In fact, Ms. Akel did not have a deflation, rupture, or leak of her left implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Akel to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. Akel did not seek a

second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(d).     In the Operative Report and OR Record dated February 26, 2010, Loren Z. Clayman represented to Ms. Akel that her left breast implant was deflated and needed to be replaced. In fact, Ms. Akel did not have a deflation, rupture, or leak of her left implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Akel to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. Akel did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(e).     After the February 26, 2010 surgery, Loren Z. Clayman made a warranty claim to Allergan regarding the left implant removed in the February 26, 2010 surgery indicating a defect of the implant. By having Ms. Akel sign this claim form Loren Z. Clayman represented to her that her left implant was leaking and/or defective and needed to be replaced. In fact, Ms. Akel did not have a deflation, rupture, or leak of her left implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Akel to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had defective breast implants; these representations also caused her to agree to have another

49

surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. Akel did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(f).     On February 2, 2011, Mark A. Clayman told Ms. Akel that her right breast implant was deflated and needed to be replaced. In fact, Ms. Akel did not have a right implant deflation, rupture, or leak, and he did not have the intention or ability to correct the actual problems with her breasts. These representations caused Ms. Akel to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Clayman, PA instead of a different plastic surgeon. As a result, Ms. Akel did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(g).     In a surgical estimate prepared on February 2, 2011, Mark A. Clayman represented to Ms. Akel that her breast implants needed to be replaced, apparently due to defect or deflation. In fact, Ms. Akel did not have a defective implant, an implant deflation, rupture, or leak, and he did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Akel to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Clayman, PA instead of a different plastic surgeon. As a result, Ms. Akel did

not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(h).     In the informed consent dated March 18, 2011, Mark A. Clayman represented to Ms. Akel that her right breast implant was deflated and that both implants needed to be replaced.  In fact, Ms. Akel did not have a defective implant, an implant deflation, rupture, or leak of her right implant, and Mark A. Clayman did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Akel to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Clayman, PA instead of a different plastic surgeon.  As a result, Ms. Akel did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(i).     In the Operative Report and OR Record dated March 18, 2011, Mark A. Clayman represented to Ms. Akel that her right breast implant was deflated and needed to be replaced.  In fact, Ms. Akel did not have a deflation, rupture, or leak of her right implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Akel to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Clayman, PA instead of a different plastic surgeon.  As a result, Ms. Akel did

not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(j).    After the March 18, 2011 surgery, Loren Z. Clayman and Mark A. Clayman made a warranty claim to Allergan regarding the right implant removed in the March 18, 2011 surgery indicating a defect of the implant.  By having Ms. Akel sign this claim form Loren Z. Clayman and/or Mark A. Clayman represented to her that her right implant was leaking and/or defective and needed to be replaced.  In fact, Ms. Akel did not have a deflation, rupture, or leak of her right implant, and neither Loren Z. Clayman nor Mark A. Clayman had the intention or ability to correct the problems with her breasts.  These representations caused Ms. Akel to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had defective breast implants; these representations also caused her to agree to have another surgery by Clayman, PA instead of a different plastic surgeon.  As a result, Ms. Akel did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(k).    On October 30, 2009 and at each visit with his office thereafter, Loren Z. Clayman and Mark A. Clayman represented to Ms. Akel that he was a competent plastic surgeon who could perform breast augmentation revision and related procedures in a reasonably competent manner that was within the standard of care.  This representation was false because he was not in fact reasonably competent to perform the requested procedures within the standard of care.  This representation caused Ms. Akel to choose

Loren Z. Clayman and Mark A. Clayman for breast surgery as opposed to other plastic surgeons.

(l).    On October 30, 2009 and at each visit thereafter, Loren Z. Clayman and Mark A. Clayman represented that he knew the appearance that Ms. Akel wanted for her breasts, and that he could achieve that appearance through the planned surgery.  In fact, whether Loren Z. Clayman or Mark A. Clayman knew what appearance she desired or not, he did not have the ability or intention to perform the procedures necessary to provide her with the desired appearance (i.e. addressing her complaints of sagging and asymmetry).  This representation caused Ms. Akel to choose Loren Z. Clayman and Mark A. Clayman for breast surgery as opposed to other plastic surgeons who would have been able to provide her with the desired appearance.

130.    As a result of the above false statements or representations, Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA were able to continue collecting money in relation to the medical and surgical care of Ms. Akel, Ms. Akel did not seek a second opinion from another plastic surgeon, and/or Ms. Akel delayed seeking legal counsel for potential medical negligence.

131.    As a direct and proximate result of the above noted false statements or representations of Loren Z. Clayman, Mark A. Clayman, and/or employees or agents of Clayman PA, Ms. Akel suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

132.    Furthermore, as a direct and proximate result of the above noted false statements or representations by Loren Z. Clayman, Mark A. Clayman, and/or employees or agents of Clayman PA, Ms. Akel spent monies in the amount of $3,750 or more for medical and/or surgical care by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA that was of no value, and which has caused her to have to incur future medical expenses for medical and surgical care to correct the damage done by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA.

WHEREFORE, the Plaintiff SUSAN E. AKEL demands judgment for damages against the Defendants LOREN Z. CLAYMAN, M.D., MARK A. CLAYMAN, and LOREN Z. CLAYMAN, M.D., P.A. together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT VI – CLAYMAN DEFENDANTS AND ALLERGAN'S CONSPIRACY TO COMMIT FRAUD AND/OR BREACH OF FIDUCIARY DUTY

133.    Ms. Akel re-alleges and incorporates by reference paragraphs 1 through 105.

134.    On or before October 30, 2009, Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA entered into an agreement with Allergan to commit fraud and/or breach of fiduciary duty.

135.    Ms. Akel re-alleges and incorporates by reference paragraphs 117 through 120 as the allegations of conduct by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA in furtherance of the breach of the fiduciary duty owed by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA to Ms. Akel.

136.    Ms. Akel re-alleges and incorporates by reference paragraphs 129 through 132 as the allegations of fraud upon Ms. Akel committed by Loren Z. Clayman and/or Clayman PA.

137.    Allergan committed one or more of the following overt acts in furtherance of the conspiracy to commit fraud and/or breach of fiduciary duty:

(a).    Paying the warranty claim of Loren Z. Clayman and/or Clayman PA, without requesting further corroboration, in relation to the left Natrelle saline filled breast implant that Loren Z. Clayman placed into Ms. Akel on November 9, 2009, and which Loren Z. Clayman surgically removed on February 26, 2010, despite the following:

(1).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Akel on November 9, 2009, and explanted from Ms. Akel by Loren Z. Clayman on February 26, 2010, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the February 26, 2010 surgery was not necessary as a result of a failed breast implant;

(2).    Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(3).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(b).    Paying the warranty claim of Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA, without requesting further corroboration, in relation to the right Natrelle saline filled breast implant that Loren Z. Clayman placed into Ms. Akel on February 26, 2010, and which Mark A. Clayman surgically removed on March 18, 2011, despite the following:

(1).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Akel on November 9, 2009, and explanted from Ms. Akel by Loren Z. Clayman on February 26, 2010, did not support a claim of "loss of shell

integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the February 26, 2010 surgery was not necessary as a result of a failed breast implant;

(2). Allergan's *Laboratory Analysis* report for the right saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Akel on February 26, 2010, and explanted from Ms. Akel by Mark A. Clayman on March 18, 2011, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the March 18, 2011 surgery was not necessary as a result of a failed breast implant;

(3). Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(4). The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(c). Continuing to sell saline filled breast implants to Loren Z. Clayman and/or Clayman PA after October 30, 2009, despite the following:

(1). Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Akel on November 9, 2009, and explanted from Ms. Akel by Loren Z. Clayman on February 26, 2010, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the February 26, 2010 surgery was not necessary as a result of a failed breast implant;

(2). Allergan's *Laboratory Analysis* report for the right saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Akel on February 26, 2010, and explanted from Ms. Akel by Mark A. Clayman on March 18, 2011, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the March 18, 2011 surgery was not necessary as a result of a failed breast implant;

(3).    Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(4).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(d).    Failing to report Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA to the appropriate authorities after October 30, 2009, despite the following:

(1).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Akel on November 9, 2009, and explanted from Ms. Akel by Loren Z. Clayman on February 26, 2010, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the February 26, 2010 surgery was not necessary as a result of a failed breast implant;

(2).    Allergan's *Laboratory Analysis* report for the right saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Akel on February 26, 2010, and explanted from Ms. Akel by Mark A. Clayman on March 18, 2011, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the March 18, 2011 surgery was not necessary as a result of a failed breast implant;

(3).    Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(4).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman, Mark A. Clayman, and/or

Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(e).    After each warranty claim was presented to Allergan by Clayman PA in relation to a saline breast implant removed from Ms. Akel, failing to conduct an appropriate and timely investigation into the cause of the reported failure/adverse event claimed by Clayman PA in accordance with federal laws and regulations.

(f).    After each warranty claim was presented to Allergan by Clayman PA in relation to a saline breast implant removed from Ms. Akel, failing to report to the FDA in a substantially complete form and timely manner each failure/adverse event claimed by Clayman PA in accordance with federal laws and regulations.

138.    As a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA, and also by Allergan, Ms. Akel suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

139.    Furthermore, as a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA, and also by Allergan, Ms. Akel has spent monies in the amount of $3,750 or more, for medical and/or surgical care by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA

that was of no value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff SUSAN E. AKEL demands judgment for damages against the Defendants LOREN Z. CLAYMAN, M.D., MARK A. CLAYMAN, M.D., LOREN Z. CLAYMAN, M.D., P.A., ALLERGAN, INC., ALLERGAN SALES, LLC, and ALLERGAN USA, INC., together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT VII – ALLERGAN AIDING AND ABETTING FRAUD AND/OR BREACH OF FIDUCIARY DUTY

140.    Ms. Akel re-alleges and incorporates by reference paragraphs 1 through 105.

141.    Ms. Akel re-alleges and incorporates by reference paragraphs 117 through 120 as the allegations of conduct by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA in furtherance of the breach of the fiduciary duty owed by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA to Ms. Akel.

142.    Ms. Akel re-alleges and incorporates by reference paragraphs 129 through 132 as the allegations of fraud upon Ms. Akel committed by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA.

143.    Allergan, through its employees or agents, knew that Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA, was committing fraud upon Ms. Akel, and/or breaching a fiduciary duty owed to Ms. Akel, due to the following:

(a).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Akel on November 9, 2009, and explanted from Ms. Akel by Loren Z. Clayman on February 26, 2010, did not support a claim of "loss of shell

integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the February 26, 2010 surgery was not necessary as a result of a failed breast implant;

(b).    Allergan's *Laboratory Analysis* report for the right saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Akel on February 26, 2010, and explanted from Ms. Akel by Mark A. Clayman on March 18, 2011, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the March 18, 2011 surgery was not necessary as a result of a failed breast implant;

(c).    Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(d).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

144.    Despite the aforesaid knowledge of Allergan through its employees or agents, Allergan provided substantial assistance to Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA in committing fraud against Ms. Akel, and/or breaching a fiduciary duty owed to Ms. Akel, in either or both of the following ways:

(a).    Paying the warranty claim of Loren Z. Clayman and/or Clayman PA, without requesting further corroboration, in relation to the left Natrelle saline filled breast implant that Loren Z. Clayman placed into Ms. Akel on November 9, 2009, and which Loren Z. Clayman surgically removed on February 26, 2010.

(b).    Paying the warranty claim of Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA, without requesting further corroboration, in relation to the right

Natrelle saline filled breast implant placed into Ms. Akel by Loren Z. Clayman on February 26, 2010, and which Mark A. Clayman surgically removed March 18, 2011;

(c).    Continuing to sell saline filled breast implants to Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA after October 30, 2009; and/or

(d).    Failing to report Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA to the appropriate authorities after October 30, 2009.

(e).    After each warranty claim was presented to Allergan by Clayman PA in relation to a saline breast implant removed from Ms. Akel, failing to conduct an appropriate and timely investigation into the cause of the reported failure/adverse event claimed by Clayman PA in accordance with federal laws and regulations; and/or

(f).    After each warranty claim was presented to Allergan by Clayman PA in relation to a saline breast implant removed from Ms. Akel, failing to report to the FDA in a substantially complete form and timely manner each failure/adverse event claimed by Clayman PA in accordance with federal laws and regulations.

145.    As a direct and proximate result of the substantial assistance provided by Allergan to Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA, Ms. Akel suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

146.    Furthermore, as a direct and proximate result of the above noted substantial assistance provided by Allergan to Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA,

Ms. Akel has spent monies in the amount of $3,750 or more, for medical and/or surgical care by Loren Z. Clayman, Mark A. Clayman, and/or Clayman PA that was of no value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff **SUSAN E. AKEL** demands judgment for damages against the Defendants, **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT VIII – ALLERGAN'S STRICT LIABILITY FOR DEFECTIVE PRODUCTS

147.    Ms. Akel re-alleges and incorporates by reference paragraphs 1 through 105.

148.    Allergan designed, researched, manufactured, assembled, tested, packaged, promoted, advertised, marketed, sold, distributed, or otherwise placed into the stream of commerce, the following saline filled breast implants:   right and left Natrelle Style 68 High Profile 350 cc saline filled breast implants with serial numbers 14389160 and 14300134, respectively, that were implanted into Ms. Akel on November 9, 2009, and explanted from Ms. Akel on February 26, 2010; right and left Natrelle Style 68 High Profile 350 cc saline filled breast implants with serial numbers 14428255 and 14565696, respectively, that were implanted into Ms. Akel on February 26, 2010, and explanted from Ms. Akel on March 18, 2011; right and left Natrelle Style 68 moderate profile 360 cc saline filled breast implants with serial numbers 16319206 and 16319209, respectively that were implanted into Ms. Akel on March 18, 2011 and remain inside her body.

149.    At all times material, Allergan expected the aforesaid saline filled breast implants to reach, and either or both did in fact reach, consumers in the State of Florida, including Ms. Akel, without substantial changes in the condition in which they were sold or distributed.

150.    At all times material, one or more of the aforesaid saline filled breast implants were being used in the manner intended, or based upon all of the circumstances reasonably expected, by Allergan.

151.    At all times material, one or more of the aforesaid saline filled breast implants were in fact defective and in an unreasonably dangerous condition at the time they were placed into the stream of commerce, and when put to their reasonably anticipated use, in one or more of the following ways:

    a.   <u>Design</u>

    (1).    One or more of the aforesaid saline filled breast implants was designed such that the valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

    (2).    One or more of the aforesaid saline filled breast implants was designed such that the valves allowed saline fluid to escape from the implant shells, causing the need for subsequent surgeries to replace the implants; and

    (3).    Prior to the time that the implants identified above were sold, distributed, and/or placed into the stream of commerce, a safer alternative design for the aforesaid saline filled breast implants existed and was commercially feasible; and

(4).    The design of the aforesaid saline filled implants was unreasonably dangerous when compared to the benefits they offered to patients who had them.

b.    Manufacture

One or more of the aforesaid saline filled breast implants was defectively manufactured such that

(1).    the valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    the valves allowed saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

c.    Warning

(1).    One or more of the aforesaid saline filled breast implants contained an inadequate warning of the risks of their valves permitting liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants contained inadequate warning of the risks of their valves allowing saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

152.    The defective condition of one or both of the aforesaid saline filled breast implants subjected patients receiving the breast implants to infection or rupture/deflation, which exceeded the benefits of the products, and for which safer products were available.    This

64

defective condition made one or both pairs of the aforesaid saline filled breast implants unreasonably dangerous when put to use as intended or reasonably expected by Allergan.

153.    The defective condition of one or both of the aforesaid saline filled breast implants directly caused or contributed to cause Ms. Akel to suffer bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

WHEREFORE, the Plaintiff SUSAN E. AKEL demands judgment for damages against the Defendants, ALLERGAN, INC., ALLERGAN SALES, LLC, and ALLERGAN USA, INC., together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT IX – ALLERGAN'S PRODUCT NEGLIGENCE

154.    Ms. Akel re-alleges and incorporates by reference paragraphs 1 through 105.

155.    Allergan was and is the entity that designed, researched, manufactured, assembled, tested, packaged, promoted, advertised, marketed, sold, distributed, or otherwise placed into the stream of commerce, the following saline filled breast implants:  right and left Natrelle Style 68 High Profile 350 cc saline filled breast implants with serial numbers 14389160 and 14300134, respectively, that were implanted into Ms. Akel on November 9, 2009, and explanted from Ms. Akel on February 26, 2010; right and left Natrelle Style 68 High Profile 350 cc saline filled breast implants with serial numbers 14428255 and 14565696, respectively, that were implanted into Ms. Akel on February 26, 2010, and explanted from Ms. Akel on March 18,

2011; right and left Natrelle Style 68 moderate profile 360 cc saline filled breast implants with serial numbers 16319206 and 16319209, respectively that were implanted into Ms. Akel on March 18, 2011 and remain inside her body.  Accordingly, at all times material Allergan owed one of more of the following duties to the patients who received the implants in surgeries:

      (a).    to properly design, assemble, and manufacture the aforesaid Natrelle saline filled breast implants so that none of them created an unreasonable risk of harm, bodily injury, or death to their users or consumers;

      (b).    to provide labels and packaging materials that adequately warned implanting surgeons and the using public of the risks and dangers associated with the aforesaid Allergan Natrelle saline filled breast implants, including but not limited to the risk of their valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents, as well as the risk of the valves allowing saline fluid to escape from the implant shells, causing the need for subsequent surgeries to replace the implants; and/or

      (c).    to conduct adequate testing on the aforesaid Natrelle saline filled implants before releasing them into the stream of commerce to ensure that they were reasonably safe for their intended use.

156.    On or before October 30, 2009 Allergan knew or should have known that the aforesaid Natrelle saline filled breast implants posed an unreasonable risk of harm, bodily injury, or death to its users, the patients who had them implanted into them.

157.    Allergan breached the duties it owed to its users, the patients who had Natrelle saline filled breast implants implanted into them, in one or more of the following ways:

a.    <u>Design</u>

(1).    One or more of the aforesaid saline filled breast implants was designed such that the valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants was designed such that the valves allowed saline fluid to escape from the implant shells, causing the need for subsequent surgeries to replace the implants; and

(3).    Prior to the time that the implants identified above were sold, distributed and/or placed into the stream of commerce, a safer alternative design for the aforesaid saline filled breast implants existed and was commercially feasible; and

(4).    The design of the aforesaid saline filled implants was unreasonably dangerous when compared to the benefits they offered to patients who had them.

b.    <u>Manufacture</u>

One or both of the aforesaid saline filled breast implants was defectively manufactured such that

(1).    One or more of the aforesaid saline filled breast implants was manufactured such that the valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants was manufactured such that the valves allowed saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

c.    Warning

(1).    One or more of the aforesaid saline filled breast implants contained an inadequate warning of the risks of their valves permitting liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants contained inadequate warning of the risks of their valves allowing saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

158.    Allergan's breach of the duty or duties it owed to users of Natrelle saline filled breast implants, including Ms. Akel, directly caused or contributed to cause Ms. Akel to suffer bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

WHEREFORE, the Plaintiff SUSAN E. AKEL demands judgment for damages against the Defendants, ALLERGAN, INC., ALLERGAN SALES, LLC, and ALLERGAN USA, INC., together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT X – CONSORTIUM CLAIM

159.    Mr. Akel re-alleges and incorporates by reference paragraphs 1 through 158.

160.    Mr. Akel was and is the lawful wedded husband of Ms. Akel, and did and does reside with her.

161.    As a direct and proximate result of the above described wrongful conduct of the Clayman Defendants and Allergan, Mr. Akel has lost the care, comfort, and companionship of Ms. Akel, and he will suffer these losses in the future.

WHEREFORE, the Plaintiff **SALEEM AKEL** demands judgment for damages against the Defendants, **LOREN Z. CLAYMAN, M.D., MARK A. CLAYMAN, M.D., LOREN Z. CLAYMAN, M.D., P.A., ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.


## CERTIFICATE OF REASONABLE INVESTIGATION

The undersigned counsel hereby certifies that he has made a reasonable investigation as permitted by the circumstances which have given rise to a good faith belief that grounds exist for the bringing of this action.

/s/ Christopher Shakib
Christopher Shakib, Esquire
**TERRELL HOGAN & YEGELWEL, P.A.**
233 East Bay Street, 8th Floor
Jacksonville, Florida 32202
Telephone:    (904) 632-2424
Facsimile:    (904) 632-5049
Primary Email: shakib@terrellhogan.com
Secondary Email: aashley@terrellhogan.com
Florida Bar No.: 0947865
Attorney for the Plaintiffs

_/s/ Leslie A. Goller_
**Leslie A. Goller, Esquire**
**TERRELL HOGAN & YEGELWEL, P.A.**
233 East Bay Street, 8th Floor
Jacksonville, Florida 32202
Telephone:     (904) 632-2424
Facsimile:      (904) 632-5049
Primary Email: lgoller@terrellhogan.com
Secondary Email: lkipp@terrellhogan.com
Florida Bar No.: 0393932
Attorney for the Plaintiffs